One case on the calendar this afternoon. CIELE PHARMA, if that's the proper pronunciation. She and I, it's easier. And Andrix v. Lupin and Mylan. Appeal number 2012-12-28. We will hear first from Mr. Hochstetler. On behalf of Lupin. May it please the court. The district court erred in rejecting Lupin's obviousness defense and clearly erred in finding a lack of merit in the non-infringement defense. Well, this is a high standard of review, isn't it? This is a review of an injunction, abuse of discretion? Yes, Your Honor, but the subsidiary elements of that, a clear error or errors of law would satisfy the abuse of discretion standard. And here we have both. Both an error of law in rejecting obviousness and clear error in the handling of infringement. Unless the court has a different preference, I would propose to start with infringement and then go to the potential. I'd rather you start with the other one, please. Yes, Your Honor. An extra laser drilled hole is not patentable. A combination, after KSR at least, must do more than achieve a predictable result. Chang, with the primary reference, disclosed a hole that would form in vivo and had one hole that was drilled in. The difference between that prior art invention, that prior art reference, and the claimed invention was two laser drilled holes that the patentee claimed changed the Tmax, that is, moved the Tmax earlier than Chang disclosed. Chang disclosed eight, right? Correct, Your Honor. A mean Tmax of eight, is that right, or higher? Right, it disclosed eight to 12. It had one example where the mean was 9.67, but the 866 patent describes disclosing a Tmax of eight to 12. The 866 patent is claiming five to seven? Five and a half to seven and a half, yes, Your Honor. Five and a half to seven and a half, and then some claims are five and a half to seven. Correct. And so what you needed Timmons for was to supplement Chang's failure to disclose less than eight. Correct, and to provide the motivation to lower the Tmax, to let the material come out faster than happened with Chang. And Timmons did that with his disclosure of the window of absorption and the example where it disclosed that it had a Tmax between four and eight. So the other side says that one of ordinary skill in the art wouldn't have combined the two references because Timmons didn't teach improved bioavailability over the immediate release tablet. And why is that wrong? It's wrong, Your Honor, and in reviewing the briefs in preparation for this, I'm afraid that the parties may have been like ships passing the night a little bit on this issue. And if I may invite the court to a couple points in the appendix in an effort to answer your question. Your Honor. If I may start at appendix page 2472, which is Timmons. Go ahead. Thank you, Your Honor. On page four, about line 17 to 19, Timmons is describing that improvements in therapeutic regime should be possible with an extended release. But the problem is, quote, conventional extended release formulations have been demonstrated to invariably compromise the availability of metformin.  Now, if we turn then to example five, Your Honor, that would be page 2502 of the appendix. The sentence that Shinogi refers to is in example five, the sentence that reads, the mean plasma profile demonstrated useful modification of drug release in vivo relative to the immediate release formulation and with no impact on bioavailability in contrast to other metformin extended formulations reported in the literature. So what Timmons is describing is, aha, we now have an extended release formulation that gives you the same bioavailability as the immediate release glucophage. And the data that's provided, and it's the AUC area under the curve data, you'll see that the glucophage number, the 10128 and the example 3, 10483, are virtually the same and consistent with the teaching that the bioavailability is the same. Now, at the risk of turning this into a treasure hunt, Your Honor, if I could ask you to turn to column 17 of the 866 patent. Page 116 of the appendix. Down around line 38, down to about 45, you'll see a discussion. I'm sorry, column 17? Column 18, I'm sorry, Your Honor, column 18. You see a discussion about figure 2 and table 3 and that the patent claims a relative bioavailability vis-a-vis glucophage of about 100% with dinner and about 80% with breakfast. And if you can see them looking at the table 3, that measure of bioavailability that they're using is the AUC. The AUC in table 3 for breakfast is 8.8 and for metformin after dinner is 0.96. So the 866 patent discloses achieving the same bioavailability as glucophage. Now we go to Chang. Chang was talking about bioavailability, but from a different perspective. It was not talking about achieving the same bioavailability as glucophage. It was simply talking about increasing the bioavailability with dinner. And again, this will be the last of the treasure, Your Honor. Page 2453 of the appendix is the portion of Chang that the plaintiff has referred to. And you'll see on this page, table 1 includes AUC data. This is a ratio of the test product versus, which is glucophage, I'm sorry, test compared to the reference product. Reference is glucophage. And you'll see on the AUC figures for fasting,  So this is a ratio of the test product versus which is glucophage. So the test is only two tenths of glucophage. And then the figures go on up to, at its height, a 0.85, 85%. So you're like my accountant on tax day. I'm not following much of what you're saying. Why don't you just, if you could, in prose, answer Judge Prost's question. I didn't get the answer from pretty much any of the many pages you just directed us to, but it could be my density. You know, so if you would just tell me in prose, what is the motivation to combine these two references and where can I find it? The motivation to combine the two references is to achieve the same overall absorption with an extended release product that was achieved with an immediate release product. And Timmons teaches that in identifying the window of absorption and lowering the Tmax in order to do that. Chang... Can you say why you'd want to do that? Like, Timmons discloses it. Yes, yes, Your Honor, it does. I'm sorry. Go ahead, tell me why. It's in order to avoid sub-therapeutic levels of drug so that you get the same absorption, the same amount of drug as you would with the immediate release. And so, and this is in contrast to Chang, where Chang is talking about increasing bioavailability, but only with food. And even with food, it still only achieved 85% of the total absorption that Glucophage was able to achieve. So the motivation is Timmons to achieve the same level of absorption as Glucophage and one would be motivated to modify Chang in order to do that, in order to move the overall absorption from 85% to 100%. We're asking the court not only to reverse the injunction, but also to declare the patent invalid. You raised the defense of misuse, patent misuse. No, Your Honor, we did not. Why not? If in your view, they are asserting claims they know they weren't entitled to because they were wrongly allowed, why isn't that an absolute classic case of patent misuse, which would render the entire patent unenforceable and entitle your client to both attorney fees and damages? Why not allow that? If I have a chance, I will now, Your Honor. The honest answer is we didn't think of it. Well, maybe if the PI goes away, you'll do it later, I guess. One of the aspects of this case, though, that it is very unusual is that the wrong patent claims are at issue here. There isn't any dispute. There's some question about exactly how it happened, but there's no question that, in fact, we've been sued on the wrong case. Can I ask you, just to make sure I understand it, because one unfortunate thing is in the prosecution history, sometimes you gave me almost single pages of office actions or responses or stuff instead of the context. And so is it right that the claims asserted against your client are 1, 3, 4, 5, and 25? I believe that's correct, Your Honor. And I was trying very hard to go through the issued patent and see which claims in the supplemental notice of allowability those corresponded to, because you agree that the examiner meant to allow in the supplemental notice of allowability the claims that are listed there, correct? Yes. Yes, Your Honor. Okay. So as best as I can tell, issued claim 3 reads almost identically on supplemental allowed claim 5. The difference, as far as I can tell, is 7.0 versus 7 without the .0 and then a dinner thing, something about dinner. And also the add from. Okay, that's right. But so the one that seems to me to be the big offender in terms of a claim that was both issued that was clearly canceled and is enforced against you or asserted against you is claim 1. Is that right? Claim 1 is... Well, and also the other claims that are dependent on it, because the other claims 4, 5, and 25 are dependent on 1. Yeah, but that doesn't make any sense. There are lots of instances where claims are invalidated by a court and the dependent ones are automatically struck down. Of course, of course, that's true. But in terms of looking at the presumption of validity, the argument there for validity was focused on the TMAX. They weren't arguing that the dissolution profile or the characteristics of the membrane or the passageway were separately patentable. So, of course, you're right that just because you strike down an independent claim doesn't mean the dependent claims necessarily fall. But in this case, they weren't arguing that those dependent claims were separately patentable. Mr. Huckstetler, you're into your rebuttal time. Do you wish to... I do wish to... That's fine. Thank you. Thank you, Your Honors. May it please the court. Good afternoon. My name is Dave Bassett from the law firm of WilmerHale, appearing on behalf of the plaintiff, Apolise Shinogi. And with me at council table is my partner, David Manspizer. The 866 patent issue in this litigation discloses an important advance in the treatment... Counsel, can I just jump right to the prosecution history for a second? Because you're asserting  Claim 1 is almost identical to Claim 1, which you canceled or your client canceled. And you all, I mean, you didn't act unscrupulously. When the examiner issued the supplemental or the notice of allowability, your client went right back and said in the appendix at 2650, excuse me, Mr. Examiner, mistakes been made here. We canceled those claims. These aren't... Those aren't the correct ones. And you point them right to the correct one, right? And then he issues a supplemental notice of allowability to the correct one. Correct. Okay. So then what ends up happening is the patent issues not with the ones from the supplemental notice of allowability, but rather with the ones from the original notice, which you all agreed and pointed out to the examiner was wrong. As to Claim 1, that is correct. Right. But then you asserted Claim 1 in this litigation. Seems like a peculiar choice. I would have limited myself to the ones you properly got once you admitted you weren't entitled to the other ones in the prosecution history. Fair enough, Your Honor. But at the same time, the claims did issue. They're entitled to a presumption of validity. They issued by what is, by your own admission, clear error. And I say by your own admission, not that you said it here or necessarily in your briefs. I was looking, actually, for that very honest admission, which I didn't find. But you can't get around the letter that you wrote to the PTO that, excuse me, Your Honor, those claims were canceled. You rejected them. You're citing the wrong ones. Fair enough, Your Honor. And the point that I think we would focus on is the substantive point, however, that the examiner  allowable over the prior art. So... No, no, no, no, no. Claim 1 is the one that goes from 5.5 to 7.5. And the examiner did not allow up to 7.5. He said that's too darn close to 8.0, which is disclosed in Chang. And he said he'd be open to reconsidering it if you gave him some special working examples, which never were provided in the prosecution history. Your Honor, that's what he said in the interview. But in the subsequent notice of allowance that he, that the examiner issued, he did allow Claim 1 over the prior art. No, no, no. He allowed Claim 1, but then you all, you had submitted your paper saying you did that in error. We actually canceled that. That is correct, Your Honor. That is correct. But the substantive point being that he did allow the claim... No, no, no. He didn't allow it. You admitted in the prosecution that it was an error. He found the claim allowable, Your Honor. He didn't find it. Somebody erroneously wrote the wrong numbers down. I mean, isn't that what happened? I mean, isn't... Otherwise, why would you all point it out to him? Not once, but twice, right? Because you filed the paper, but then you didn't see the paper. So you then faxed it to, you couldn't find the paper in the prosecution history. Then you faxed it to him afterwards to make sure he got it. Right. Mr. Bassett, why don't we get to the heart of this case? It's really a question of whether these two references make the claims obvious. And they're really dealing with sustained release formulations of metformin. It looks as though very easily you can vary the Tmax. And why aren't these, why aren't the claims obvious? We disagree that it's very easy, of course, Your Honor. The 866 patent focuses on an extended release form of metformin. Metformin has been known for many years as a treatment for diabetes. But the challenge that researchers faced in trying to find, formulate an extended release form, dogged researchers for many years. You know, when I look at this patent, if it's so difficult, one would look for a magic bullet that goes right to the heart of it and says, this is it. This is all over the place. Anything works. You can do all of these things. And it looks like it's an attempt to claim any method of getting a Tmax in this approximate area. I think, Your Honor, I understand what you're saying. But I think the fact of the matter is that, that I understand your point. I think the fact of the matter is that with the researchers who were trying to come up with this formulation, there are many variables that are coming into play and trying to come up with an extended release form of a drug that's both highly soluble. So it dissolves very quickly when it gets in water. And secondly, it's only active in the upper GI, where most substances only stay for a few hours. So they are trying to vary both the outer layer, where there's permeable, impermeable to water, whether it has openings. I don't see in claim one a precise solution. It seems that you're claiming an effective dose and you're trying to achieve a result. It doesn't look like a magic bullet that you found in this. President Reagan used to say there must be a pony in here somewhere. Right. Where's the pony here? Well, certainly it's in the disclosure of the H66 patent, Your Honor, we would submit. But more importantly, I think to go to the obviousness question, there was no reasonable likelihood of success before the teaching of the H66 patent. Researchers have been trying for over 10 years to try to target that extended release period with this drug. Is the element that's missing from Chang, the Tmax below eight, that's the element that's missing? Well, that is the element of the claim that is... Well, that's what you look at. Yes, absolutely. Okay. So the thing that's missing from Chang is Tmax means below 8.0. Why doesn't Timmins provide that? Because, at least two reasons, Your Honor. First, Timmins doesn't teach a mean Tmax in that range. Yeah, but here's the problem. Go to A2502. All right. Now, we noticed that everything else is in mean, but you're exactly right. There's an asterisk that says median, right? Tmax on A2502. This is the Timmins reference, the example five, that would be point two in this case so far. All right. So we know from about line 16 that the results presented in the table are for 24 patients to whom this was administered immediately after dinner. Yes. Then we also know that the median was five with a lower limit of four and an upper limit of eight. Yes. Okay. Do you know that mathematically it's impossible for that to result in a mean that's higher than 6.33? I agree with that. But it's certainly mathematically possible. So why is that not disclosing a mean below 7.5 within the claimed range? Because it is mathematically possible in many different formulations for it to be below the range claimed in the 866 patent. To give one example, let's say of those 24 patients, 10 of the patients have a mean Tmax of four hours, 13 of them had a Tmax of five hours, and one of them had a Tmax of eight hours. It would result in 4.67. That's correct. Yeah. I already did that. But why isn't this providing the motivation to lower the Tmax in 98% of or 90% of the examples, 98% of the 24 different patients and the numbers that could possibly fit into this, it's right within the claimed range. And in only a couple of them, does it fall below the claim range? But the whole issue following Chang and the examiner was nothing discloses below eight. Well, so if you had something that disclosed 4.67 and then something that disclosed eight, why isn't the range of five and a half to seven and a half obvious  Again, that goes into the teaching to combine or the motivation to combine, Your Honor. First of all, Timmons doesn't teach increased bioavailability, and Chang does. So why would a person of ordinary skill in the art be motivated to combine a reference that doesn't teach increased bioavailability with a reference that does? Secondly, Timmons says, in contrast to Chang, which says, surprisingly, there's increased bioavailability in the presence of food. Timmons says, we have no impact on bioavailability. So what is the teaching to combine? Secondly, or thirdly, where is the reasonable likelihood of success? Your Honor, the failure of others is a relevant consideration here. At least for 10 years, metformin in a quick-acting form had been on the market and available. Researchers had been targeting the goal of increased and extended release forms. Despite efforts of many researchers, no one was able to achieve this range. I think we're willing to acknowledge, and we do acknowledge, and it's even in the 866 patent, that it was known that the primary time when a human body produces the maximum amount of glucose is about 2 a.m. in the morning. You think if you take the pill after dinner, that gives you the time range that you would target with this patent. There was a motivation. People certainly knew they wanted that time range, but they couldn't do it. That's the point. There was no reasonable anticipation of success until the 866 patent. In your view, did the district court apply the correct standard under KSR? Did it apply KSR, and if so, is that the correct standard? I believe it did, Your Honor, because under KSR, obviously KSR clarified the rules in this area quite significantly. Is that correct? KSR clarified the rules? That's a novel statement. KSR made clear what the rules are that apply in obviousness cases. We believe the district court applied that standard appropriately. Then what was all this narrative in the district court's opinion about how this case is distinguishable and different from KSR because the prior art was before the patent. That suggested to me that the district court did not think that he should appropriately apply the KSR test. I agree that that statement is not the appropriate distinction over KSR, but the substantive application that the judge applied, we do think was appropriate. But was it different than KSR? Was it something other than KSR? No, Your Honor. And why was he... And then there's a couple of portions where he's doing a distinction between this and KSR. What is the purpose of drawing a distinction between this case and KSR, if not for the fact that he's not going to apply the standard of KSR? I think, Your Honor, it was an appropriate factual distinction between this case and the facts that occurred in KSR. Yeah, but it had to have some relevance. It wasn't just saying it for the sake of saying it. That distinction had some relevance to his analysis. What relevance did it have? That the judge was properly applying the heightened standard that applies when the only references that are being asserted in an obviousness case were already considered by and rejected by the patent office. But he seemed to think that KSR was therefore distinguishable for that circumstance, that what KSR was talking about was where the references were not before the examiner, and this case was somehow different. Am I misreading what he said? I did not read it that way, Your Honor. I understand what I can see that that would be a possible interpretation of what the district court said. But I do think, though, that the subordinate point being that he then went on, the judge did go on to apply the appropriate obviousness standard post-KSR. So I read that part of the opinion as saying this is different than KSR because these references were considered by the examiner and rejected by the examiner. And that case law is clear, even post-KSR, that that impacts how the burden that is faced that the party is there. Does it? Is that the law? Well, the language that's used is what heightened... Was there a different standard? The added burden language. That the party challenging the validity of a patent faces, what this court has said, an added burden when the only references that are being cited for an obviousness attack on a patent are those that were already considered and rejected by the patent office. I think that's appropriate. Do you think if the references of KSR had been before the patent office, they would have upheld... The Supreme Court would have upheld the patent? I do not, Your Honor. I do not. I think the substantive rule that... They either decided or the summary judgment didn't. That's right. You're absolutely right. I am not suggesting that... And do you think the court would have applied a different... Modified the standard articulated in KSR in any way, shape, or form with the references? No, I don't, Your Honor. Because my read of the district court opinion is that he thought differently. And again... Do you think that's a fair reading? I think it's a fair reading. I respectfully disagree with that reading, but I think I would make the additional point that even if that were the case, he then went on to apply the appropriate evidentiary standard post-KSR. So the substantive result is still appropriate and accurate even if he thought... Even if the district court thought incorrectly that that is some way to distinguish KSR. I don't agree that would be an appropriate basis to distinguish KSR. There's certainly nothing we argued to the district court judge. And that's not how I read the opinion, but I appreciate the point Your Honor is making. I still think, though, that he went on to say, look, there's still no teaching to combine. There's still no reasonable expectation of success. And these references were before the examiner who found the claims allowable over this prior art. In that situation, we have shown, that is, the plaintiff has shown a likelihood of success in overcoming this obvious misdefense. Thank you, Mr. Bassett-Wolf. Hear from Mr. Hofstetter a little rebuttal time. You have just under three minutes. First, to repeat what I said earlier, and hopefully clearly, the motivation provided by Timmons was to achieve in an extended release metformin tablet the same absorption that was achievable with an immediately released glucofage. But my only other point would be a request to this court, if this court is willing to reverse the preliminary injunction. Last time when this panel vacated the preliminary injunction, the lupin was left a bit in limbo because we had to wait for the mandate to come down and the Chianogi took the position. Until the mandate came down, we were still subject to the injunction. So I would ask you if the court would be willing to reverse the preliminary injunction that your honors, perhaps in terms of ruling on our motion to stay or however else, make it clear about exactly so we're not left in limbo while we're waiting for the mandate. Unless the court has any other questions, I have nothing further. Thank you, Mr. Hofstetter. We'll take the case on revisal. All rise.